IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MAXINE BOHREER, et al., | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ERIE INSURANCE GROUP, et al., | ) |
|     Defendants. | ) |
| _____ | )  Case No. 1:06cv555 |
| | ) |
| ERIE INSURANCE GROUP, et al., | ) |
|     Third-Party Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| HALLMARK INSURANCE | ) |
| GROUP, INC., et al., | ) |
|     Third-Party Defendants. | ) |

**MEMORANDUM OPINION**

In this insurance coverage dispute, plaintiffs have asserted four claims against defendants alleging that defendants had a duty to defend and indemnify plaintiff Northern Virginia Funeral Choices, Inc. ("NVFC") against claims that NVFC breached its contract with plaintiffs Maxine Bohreer and Tricia King to cremate and return the remains of Marion J. Bohreer. Additionally, defendants have asserted contract and tort claims against third-party defendants, seeking contribution and indemnity in the event defendants are liable to plaintiffs.

At issue are: (i) defendants' motion for summary judgment; (ii) plaintiffs' cross-motion for partial summary judgment; and (iii) third-party defendants' motion for summary judgment. As these motions have been fully briefed and argued, they are now ripe for disposition. For the reasons that follow, defendants' motion for summary judgment and third-party defendants'

motion for summary judgment must be granted on the ground that the undisputed facts demonstrate that defendants had no duty to defend or indemnify NVFC against the claims brought by plaintiffs Maxine Bohreer and Tricia King.

**I.**[1]

On October 20, 2001, Marion Jay Bohreer died in Scottsdale, Arizona. The same day, plaintiff Maxine Bohreer, Mr. Bohreer's wife, spoke on the telephone with a representative from the Anatomic Gift Foundation, Inc. ("AGF"). During the conversation, Mrs. Bohreer authorized AGF to utilize Mr. Bohreer's body for organ donation, and then to have his remains cremated and returned to Mrs. Bohreer. Pursuant to this authorization, AGF utilized Mr. Bohreer's body for medical science and transported his remains to NVFC, a crematory in Chantilly, Virginia. On November 3, 2001, Mr. Bohreer's remains were cremated. Then, on November 20, 2001, Mrs. Bohreer received a box from AGF labeled "Family Pet Cremations." The label further identified the contents as the remains of a pet named Marion Jay Bohreer cremated on November 3, 2001. Ultimately, a pathology evaluation of the cremated ashes in the box disclosed they were non-human. The record does not disclose the current whereabouts of Mr. Bohreer's remains.

Thereafter, on October 24, 2002, Mrs. Bohreer and plaintiff Tricia King, Mr. Bohreer's daughter, filed an amended complaint, *inter alia*, against NVFC in the Superior Court of Arizona (the "Underlying Action") alleging:

(i) That NVFC breached its contract to cremate and return the remains of Mr. Bohreer by "mishandl[ing] the cremains of Marion Jay Bohreer and either los[ing]

---

[1] The facts recited here are derived from the record as a whole, pursuant to Rule 56, Fed. R. Civ. P., and are largely undisputed. Where disputes exist, they are noted and, if material, the facts are construed favorably to the non-moving party, as required. *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

          and/or convert[ing] the remains, or commingl[ing] the cremains with those of an animal;

(ii)     That NVFC breached the covenant of good faith and fair dealing, *inter alia*, by "not safeguard[ing] and control[ling] the body of Marion Jay Bohreer and provid[ing] Plaintiffs with the unadulterated cremated remains"; and

(iii)    That NVFC intentionally, recklessly, or negligently interfered with Mr. Bohreer's body by "remov[ing], withh[olding], mutilat[ing] or improperly cremat[ing] the body and remains of Marion Jay Bohreer," thereby causing plaintiffs emotional distress and physical injury.

Once suit was filed, NVFC contacted its insurance agent, third-party defendant Mark Goldberg, a licensed insurance broker authorized to sell defendant Erie Insurance Group's ("Erie") policies, to request that Erie provide a defense and coverage. Thus, on November 1, 2002, Goldberg submitted to Erie a Report of Loss notifying Erie of the Underlying Action. The Report of Loss also states "[w]e have no funeral directors professional [liability endorsement] on this policy. The previous policy [] did." Several weeks later, on November 26, 2002, Erie denied NVFC coverage for the Underlying Action, stating that "coverage does not apply nor is there a duty to defend this matter under your Ultraflex Policy."

In October 2001, at the time of the alleged mishandling of Marion Bohreer's remains, NVFC was insured by Erie through an Ultraflex Policy.[2] This Policy provided that Erie would pay for damages resulting from "bodily injury or property damage for which the law holds" the insured, NVFC, "responsible and which are covered by [NVFC's] policy," provided the injury or damage was caused by an "occurrence." Erie denied NVFC coverage for the Underlying Action,

---

[2]NVFC was originally covered under an Erie Ultrapack Policy that classified NVFC as a funeral home. Erie later discovered that NVFC was providing chiefly crematory services. As the Ultrapack Policy did not provide coverage for crematory operations, Erie cancelled NVFC's Ultrapack Policy effective January 27, 2000, and issued NVFC the Ultraflex Policy at issue here, which did cover crematory operations.

citing various Ultraflex Policy exclusions. Specifically, Erie stated that the Ultraflex Policy did not provide coverage for the allegations in the Underlying Action because:

(i) The allegations in the Underlying Action do not constitute an "occurrence;"[3]

(ii) The allegations in the Underlying Action do not constitute "bodily injury;"[4]

(iii) The allegations in the Underlying Action are excluded from coverage under the "liability assumed by contract" exclusion;[5]

(iv) The allegations in the Underlying Action are excluded from coverage under the "care, custody, or control" exclusion;[6]

(v) The allegations in the Underlying Action are excluded from coverage under the "professional services" exclusion;[7] and

(vi) The allegations in the Underlying Action are excluded from coverage because

---

[3]"Occurrence" is defined as "an accident, including continuous or repeated exposure to the same general, harmful conditions."

[4]"Bodily injury" is defined as "physical harm, sickness or disease sustained by a person," and "includes care and loss of services and death at any time resulting from bodily injury."

[5]This exclusion provides that Erie

do[es] not cover under Bodily Injury Liability . . . and Property Damage Liability . . . liability assumed by anyone we protect in a contract or agreement. This exclusion does not apply to:

(a) liability assumed in a contract or agreement that is an insured contract provided the bodily injury or property damage occurs after the execution of the contract or agreement;

(b) liability that anyone we protect would have in the absence of the contract or agreement.

[6]This exclusion provides that Erie does not cover "property damage to . . . personal property in anyone we protect's care, custody or control."

[7]This exclusion provides that Erie does not cover "damages due to any service of a professional nature, including but not limited to . . . 2) supervisory, inspection, or engineering services . . ."

NVFC did not comply with the Notice Provision.[8] Given this, Erie declined to defend or indemnify NVFC with respect to the Underlying Action.

On March 31, 2005, after Erie denied coverage, NVFC settled the Underlying Action and assigned to the Underlying Action plaintiffs, Mrs. Bohreer and Ms. King, all rights and claims NVFC has or may have against Erie, Goldberg, or Hallmark Insurance Group, Inc. ("Hallmark"). Relying on this assignment, on March 29, 2006, plaintiffs Mrs. Bohreer, Mrs. King, and NVFC filed the instant complaint against Erie alleging

    (i)    that Erie breached the insurance contract by refusing to defend and/or indemnify NVFC as to the Underlying Action;

    (ii)    that NVFC's insurance policy should be reformed consistent with the original Ultrapack Policy and;

    (iii)    that NVFC is entitled to declaratory judgment; and

    (iv)    that Erie acted in bad faith in denying coverage.

On June 12, 2006, Erie filed a third-party complaint against Goldberg and Hallmark alleging

    (i)    that third-party defendants breached the agency agreement with Erie;

    (ii)    that third-party defendants acted negligently; and

    (iii)    that, to the extent Erie is liable, third-party defendants are liable for contribution and indemnity.

Next, by Order dated July 7, 2006, liability and damages issues were bifurcated so that disputes related to coverage and reformation would be resolved first, and then the issues of damages and bad faith would be addressed, if necessary. *Bohreer v. Erie Ins. Group*, No. 1:06cv555 (E.D. Va. July 7, 2006) (Order). Pursuant to this bifurcation, the parties now seek

---

[8] The Ultraflex Policy provides that "[w]hen there is an accident, occurrence, offense, claim, or suit, anyone we protect will: 1. notify us or our Agent in writing as soon as possible."

summary judgment on certain dispositive liability issues. Specifically, plaintiffs and defendants seek summary judgment on the issue of Erie's duty to defend and indemnify plaintiff NVFC with respect to the Underlying Action. In addition, third-party defendants seek summary judgment on Erie's third-party complaint, arguing that they cannot be liable if Erie is not liable.

## II.

The summary judgment standard is too well-settled to require elaboration here. In essence, summary judgment is appropriate only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). And importantly, to defeat summary judgment the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In this case, the material facts are essentially uncontested and the dispute turns entirely on whether these uncontested facts fit within the scope of coverage provided by Erie in the Ultraflex Policy. Given this, adjudication by way of summary judgment is appropriate.

## III.

In this insurance contract dispute, the issue is whether the allegations asserted in the Underlying Action fall within the scope of the insurance policy such that Erie had a duty to defend and indemnify NVFC in that action. Under Virginia law,[9] the duty to defend "arises

---

[9] As this case is brought under federal diversity jurisdiction, Virginia choice of law rules apply. *America Online, Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89, 92 (4th Cir. 2003). And, it is settled Virginia law that "a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." *Res. Bankshares Corp. v. St Paul Mercury Ins. Co.,* 407 F.3d 631, 635-36 (4th Cir. 2005). As the parties agree, the Ultraflex Policy at issue here was delivered to NVFC in Virginia, it follows that Virginia law governs issues of interpretation and breach of the insurance contract.

whenever the complaint [against the insured] alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." *VEPCO v. Northbrook Property & Cas. Ins.*, 252 Va. 265, 268 (1996). Virginia law also recognizes that the duty to defend is broader than the duty to indemnify. *Id.; Town Crier Inc. v. Humme*, 721 F. Supp. 99, 101 (E.D. Va. 1989). As both the duty to defend and the duty to indemnify are at issue, analysis properly begins with determining whether Erie had a duty to defend NVFC in the Underlying Action. If so, then the next step is to determine whether Erie has a duty to indemnify NVFC. If, on the other hand, Erie had no duty to defend NVFC in the Underlying Action, then it follows that it has no duty to indemnify NVFC. *See Morrow Corp. v. Haleysville Mut. Ins. Co.*, 101 F. Supp. 2d 422, 426-27 (E.D. Va. 2000) (stating that "a duty to defend may arise even though ultimately no duty to indemnify is found, but if there is no duty to defend *ab initio*, there can be no duty to indemnify"); *see Travelers Indem. Co. v. Obenshain*, 219 Va. 44, 46 (1978).

  The threshold inquiry, then, is whether Erie had a duty to defend NVFC in the Underlying Action. In this regard, it is well-settled that an insurer is not obligated to defend its insured when "under the allegations of the complaint [against the insured], it would not be liable under its contract for any recovery therein had." *Id.* Put simply, "where it appears that the insurer would not be liable under the policy for any judgment based on the allegations in the underlying complaint, it has no duty even to defend." *Morrow*, 101 F. Supp. 2d at 426-27. To determine whether the allegations in the underlying lawsuit fall within the scope of the policy terms, courts must be guided by a combination of the Exclusive Pleading Rule and the Potentiality Rule. *Id.* Under the Exclusive Pleading Rule, an insurer's duty to defend is determined solely by examining the claims asserted in the underlying action to determine whether those claims fall

within the scope of the policy. *Id.* Under the Potentiality Rule, an insurer's duty to defend is triggered if there is any possibility that a judgment against the insured will be covered under the insurance policy. *Id.* Accordingly, to determine whether Erie had a duty to defend NVFC in the Underlying Action, it is necessary to determine whether any of the claims asserted in the Underlying Action potentially come within the policy's scope of coverage. This is accomplished by applying the "eight corners rule," which requires comparing solely the policy terms with the claims asserted against the insured in the underlying complaint. *Erie Ins. Exch. v. State Farm Mut. Auto. Ins. Co.*, 60 Va. Cir. 418, 423 (2002).

When construing the policy terms, it is critical to bear in mind that an insurance policy is a contract governed by rules of contract interpretation. *Harleysville Mutual Ins. Co. v. Dollins*, 201 Va. 73, 77 (1959). Thus, unambiguous policy terms are afforded their plain and ordinary meaning. *Town Crier,* 721 F. Supp. at 102 (*citing Ocean Accident & Guar. Corp. v. Washington Brick & Terra Cotta Co.,* 148 Va. 829 (1927)). On the other hand, because "the principal purpose of insurance is protection," and because insurance policies are typically drafted by insurers, any ambiguities in policy terms are "construe[d] [] in favor of coverage or indemnity and against a limitation of coverage." *United Services Auto Assoc. v. Webb*, 235 Va. 655, 657 (1988). Thus, while the party seeking coverage bears the ultimate burden of proving by a preponderance of the evidence that it is entitled to coverage, the insurer bears the burden of proving that an exclusion applies. *Town Crier*, 721 F. Supp. at 101 (*citing Johnson v. Ins. Co. of North America*, 232 Va. 340 (1986)). Importantly, these rules "do not authorize a court to rewrite the policy for the parties, nor to construe a policy contrary to its plain language or to the parties' intent." *Id.* (*citing Washington Brick*, 148 Va. at 844). With these principles in mind,

the question presented, then, is whether the allegations contained in the Underlying Action could potentially fall within the risk covered by the Ultraflex Policy.

  Analysis of this question properly begins with examination of the four corners of the Ultraflex Policy, and in particular, the professional services exclusion, which Erie chiefly relies on to assert that it had no duty to defend NVFC in the Underlying Action. The professional services exclusion provided that the Ultraflex Policy would not cover "damages due to *any service of a professional nature*, including but not limited to . . . 2) *supervisory*, *inspection*, or engineering services . . ." While the Ultraflex Policy did not define the phrase "any service of a professional nature," the phrase is commonly used in insurance policies and thus, many courts have had occasion to consider its application. Thus, it is well-established that to determine the scope of a "professional services" provision "courts must look to the nature of the insured's act or conduct," to determine whether the insured's act "arise[s] out of the rendering or failure to render . . . . 'professional services.'" *See St. Paul Fire & Marine Ins. Co. v. Jacobson,* 826 F. Supp. 155, 160-61 (E.D. Va. 1993). In other words, courts must determine whether the action arises out of a service that "exacts the use or application of special learning or attainments of some kind." *Id.* To determine if an action "arises out of" a professional service, it is necessary to identify the professional service at issue. In *St. Paul*, the court found that the insured's fraudulent use of his own semen to inseminate his patients amounted to "professional services" for which the insurance contract provided coverage. *Id.* at 160. In reaching this result, the court acknowledged that the insured's act in producing sperm, *i.e.* masturbation, did not constitute professional services, as it did not arise out of a vocation, calling, or employment involving specialized knowledge, labor, or skill. *Id.* Nevertheless, the court found that the professional

service at issue was the provision of artificial insemination, and not the act of producing semen. *Id.* Focused in this way, it was clear in *St. Paul* that the act giving rise to the harms alleged in the underlying action there, that is, the fraudulent use of the insured's sperm for artificial insemination, involved the provision of professional medical services requiring skill and knowledge. It further followed that because the medical technique of insemination was inextricably intertwined with the fraudulent artificial insemination, the fraudulent artificial insemination constituted a professional service. *Id.* at n.9.[10] These principles, applied here, compel the conclusion that the Ultraflex Policy excludes from coverage "any service" arising out of, or inextricably intertwined with, the professional service of cremation,[11] "including . . . *supervisory*, [or] *inspection*" services.

The next step in the analysis is to examine the four corners of the Underlying Action complaint to determine whether its allegations fall within the scope of the professional services exclusion, in which case Erie would have no duty to defend or indemnify NVFC. On the other hand, Erie would have a duty to defend, and potentially to indemnify NVFC, if the allegations in the Underlying Action complaint plausibly might cover some set of facts that fall outside the

---

[10]*See also United Fire and Casualty Co. v. Hixson Brothers,* Inc., 453 F.3d 283, 287-88 (5th Cir. 2006) (finding that the alleged failure of the funeral home to provide goods and services in the burial policy, arising out of a casket pricing disparity, constituted a professional services allegation as it arose from the provision of funeral services and the burial policy); *Harad v. Aetna Casualty and Surety Co.*, 839 F.2d 979, 984-85 (3d Cir. 1988) (holding that professional liability exclusion applied to a malicious prosecution claim brought against an attorney because the attorney's liability "flowed directly from his performance of a professional activity," *i.e.*, signing and filing an answer and counterclaim).

[11]Virginia requires a license to conduct cremations and operate a crematory establishment, thus, neither party disputes that performing cremations is a professional service. *See* Va. Stat. Ann. § 54.1-2814.1.

exclusion.

      The Underlying Action complaint contained three counts against NVFC:

(i)      Count II: NVFC breached its contract to cremate and return the remains of Mr. Bohreer by "mishandl[ing] the cremains of Marion Jay Bohreer and either los[ing] and/or convert[ing] the remains, or commingl[ing] the cremains with those of an animal;

(ii)      Count III: NVFC breached the covenant of good faith and fair dealing, *inter alia*, by "not safeguard[ing] and control[ling] the body of Marion Jay Bohreer and provid[ing] Plaintiffs with the unadulterated cremated remains"; and

(iii)      Count IV: NVFC intentionally, recklessly, or negligently interfered with Mr. Bohreer's body by "remov[ing], withh[olding], mutilat[ing] or improperly cremat[ing] the body and remains of Marion Jay Bohreer," thereby causing plaintiffs emotional distress and physical injury.

In essence, plaintiffs sued NVFC for, *inter alia*, "mishandl[ing] the cremains," "not safeguard[ing] or controll[ing] the body," not "provid[ing] Plaintiffs with the unadulterated cremated remains," and "improperly cremat[ing] the body and remains of Marion Jay Bohreer." These claims fall squarely within the professional services exclusion, as they arise out of, or are inextricably intertwined with the professional service of cremation. Attempting to avoid this clear result, NVFC focuses on Paragraph 17 of the complaint in an attempt to characterize the Underlying Action as alleging simply a "clerical" error, that is, the mislabeling of Marion Bohreer's remains. Paragraph 17 states that Maxine Bohreer and Tricia King received a box "marked with labels from Defendant AGF and from a facility entitled 'Family Pet Cremations,' . . . identifying the cremains as a 'pet' named Marion Jay Bohreer."[12] Even assuming, as plaintiffs

---

[12] It is worth noting that Paragraph 19 of the Underlying Action complaint alleges, not that the remains were "mislabeled," but rather that "the cremains are either not those of Marion Jay Bohreer or are, at a minimum, cremains that have been commingled with those of an animal." This allegation reflects that the plaintiffs in the Underlying Action were not alleging a claim for mere mislabeling, but rather, were alleging a claim for mishandling the remains.

contend, that the Underlying Action alleged the mislabeling of Marion Bohreer's remains, this allegation also plainly "arise[s] out of the rending or failure to render . . . . 'professional services,'" and thus, falls squarely within the scope of the policy's professional services exclusion. The allegations contained in the Underlying Action go to the very essence of the professional service provided by a crematory, namely the proper performance of a cremation and the proper delivery of the unadulterated cremated remains. To perform the professional service of a cremation, it is unmistakably necessary to maintain a chain of custody to ensure that the proper unadulterated cremated remains are delivered to the proper recipient. There is simply no doubt that where, as here, the "clerical" act is necessary to perform the professional service properly, that act "arises out of" a professional service.[13] And, significantly, this is true even where the allegedly negligent act may have been performed by someone other than the "professional."[14] This is so because "[e]ven if a professional utilizes the services of a non-professional in connection with the performance of its contractual services, the professional nonetheless remains the liable party for the work performed." *Id.* Thus, "[t]o suggest that the

---

[13] *See Alpha Therapeutic Corp. v. St. Paul Fire and Marine Ins. Co.*, 890 F.2d 368, 370-71 (11th Cir. 1989) (finding clerical task constituted professional service where the clerical task, if performed improperly, affects the professional service provided); *Northern Ins. Co. v. Super. Ct. Etc.,* 91 Cal.App.3d 541 (Cal. App. 1st Dist. 1979) (administrative error of confusing patients is part of professional service); *Antles v. Aetna Casualty*, 221 Cal. App.2d 438 (Cal. App. 2d Dist 1963) (adjusting lamp which fell and burned patient is part of professional service).

[14] *Webster County Solid Waste Auth. v. Brakenrich & Assocs.*, 217 W. Va. 304, 312 n.11 (2005) (holding that professional liability exclusion applied to action alleging negligent inspection of professional engineering services). Importantly, this conclusion is supported by the express terms of the professional services exclusion, which states that Erie does not cover any claim for services of a professional nature, including those arising from "supervisory" or "inspection" services. Thus, any allegation arising out of NVFC's failure to properly supervise the cremation services and/or inspect the cremated remains, is excluded under the professional services exclusion.

use of any non-professional to perform some part of the professional undertakings contemplated in a professional services contract somehow alters the nature of services being performed is simply untenable." *Id.; see Alpha Therapeutic Corp. v. St. Paul Fire and Marine Ins. Co.*, 890 F.2d 368, 370-71 (11th Cir. 1989) (finding that transcription error of medical technician testing blood was committed while performing a professional service). As the clerical act of labeling cremated remains is inextricably intertwined with the professional service of cremation, the allegations of the Underlying Action complaint fall squarely within the Ultraflex Policy's professional services exclusion. Accordingly, Erie had no duty to defend NVFC in the Underlying Action.[15]

Yet, this does not end the matter as plaintiffs claim that the Ultraflex Policy should be reformed to include the "Funeral Directors' Professional Liability Endorsement" ("FDPLE"), a provision that had been included in NVFC's previous insurance policy (the "Ultrapack Policy"). Under Virginia law, a court may reform a written contract if there is a mutual mistake, meaning that "there has been a meeting of minds as to the agreement actually entered into, but the contract . . . does not express what was really intended by the parties." *Dickenson County Bank v. Royal Exchange Assur. of London,* 157 Va. 94, 103 (1931). In the context of an insurance policy, "a mistake by an agent concurred in by an insured is a mutual one affording a basis for reformation." *Birkett v. Pyles*, 2 Va. Cir. 91, 92 (1983). To establish mutual mistake, the challenging party, here NVFC, bears a "high degree of proof." It must "prove . . . [its] right to reformation by evidence that is clear, convincing and free from reasonable doubt." *Id.* The

---

[15]As Erie had no duty to defend NVFC in the Underlying Action, pursuant to the professional services exclusion, it is unnecessary to decide whether the other exclusions asserted by Erie would also preclude coverage.

record facts fall short of this high threshold.

To begin with, NVFC was originally covered under an Erie Ultrapack Policy that classified NVFC as a funeral home and contained the FDPLE. At the time the Ultrapack Policy issued containing the FDPLE, NVFC had not yet installed the equipment necessary to perform crematory services. Thus, because it was classified as a funeral home, the FDPLE was included and it provided that Erie would pay damages because of bodily injury or property damage

> arising out of the rendering or failure to render any professional services *as a funeral director*, including the . . .
> a. embalming, handling, disposition, burial, disinterment, eye enucleation, or removal of a body, or
> b. conduct of any memorial service . . . ."

In addition, the FDPLE provided coverage for "injury to, destruction of or interference with the right of burial of a body." Erie later discovered that NVFC had installed crematory equipment and was providing chiefly crematory services. As the Ultrapack Policy did not provide coverage for crematory operations, Erie sent NVFC a Notice of Cancellation cancelling NVFC's Ultrapack Policy effective January 27, 2000. On the same date, NVFC's Ultraflex Policy, which did cover crematory operations, was issued, omitting the FDPLE. Goldberg testified that he believed the FDPLE would be included automatically in the new Ultraflex Policy and that he "intended the coverage to be very similar when [he] rewrote it." Erie counters that the FDPLE could not be added to NVFC's Ultraflex Policy as NVFC was ordered, in November 1999, by the Fairfax County Department of Planning and Zoning, to cease providing funeral services. In the end, this

dispute is immaterial because, even assuming reformation is appropriate,[16] inclusion of the FDPLE would not provide coverage for the allegations asserted in the Underlying Action.

Plaintiffs contend that the FDPLE would cover the allegations in the Underlying Action because the allegations do not involve the act of cremation, but rather the mishandling of the remains after cremation. This, plaintiffs argue, is sufficient to bring the allegations in the Underlying Action within the provisions of the FDPLE. Plaintiffs' position ignores the plain meaning of the FDPLE, which provides coverage for damages arising out of the provision of "funeral director" services. Webster's defines a funeral director as "one whose profession is the management of funerals and who is usually an embalmer." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004). This definition aligns precisely with the FDPLE's illustrative list; it states that funeral director's services include services such as embalming, conducting a memorial service, and the right of burial. By contrast, as defined by Webster's, a crematory provides a service distinct from funeral director's services, namely the reduction of a dead body to ashes.

---

[16] Although not decided herein, it is important to note that reformation may be inappropriate where, as here, the insured failed to read the insurance policy, and thus, is chargeable with contributory negligence. *See Wysong & Miles Co. v. Employers of Wausau*, 4 F. Supp. 2d 421, 430-31 (M.D. N.C. 1998) (holding that reliance on statements of insurer's agents that are contrary to the unambiguous policy provisions is unreasonable as a matter of law); *General Ins. Co. of Roanoke v. Page*, 250 Va. 409, 411-12 (1995) (holding that in negligence actions against insurance agent insured was bound by an insurance policy that he signed without reading). Additionally, reformation may be inappropriate where, as here, the old policy was cancelled and a new policy went into effect, which, as a review of the declarations pages would have disclosed, did not contain the FDPLE. *See Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228, 1237 (4th Cir. 1996) (finding that notice of policy change contained in declarations page was sufficient to bind the insured because "the insured has the duty to read the notice, and the insurer is not responsible for an insured's failure to do so"); *Dungey v. Haine & Britton*, 155 Ill. 2d 329 (1993) (noting that even where the insured has not executed a new application or entered into a new contract, sufficient notice of a change in policy can be provided by clear indication on the declaration pages).

*Id.* Nowhere does the FDPLE suggest that it provides liability coverage arising from a funeral director's services related to the reduction of a dead body to ashes, or to the commingling of cremated remains, or to injury to the right to receive unadulterated cremated remains. And, indeed, this omission appears to be intentional as Erie's Ultraflex Policy rules state that Erie will not issue professional liability coverage for crematories.[17] Plaintiffs' attempt to expand the FDPLE's coverage by asserting that it includes the handling of cremated remains cannot succeed where neither the ordinary and plain meaning of funeral director, nor the examples provided by the FDPLE, warrant such an interpretation. In these circumstances, Virginia law does "not authorize a court to rewrite the policy for the parties, nor to construe a policy contrary to its plain language or the parties' intent." *Town Crier*, 721 F. Supp. at 101. Thus, where, as here, the allegations contained in the Underlying Action arise not out of the provision of a funeral or embalming service, but rather, arise directly out of the reduction of a dead body to ashes, it is patently evident that the plain, unambiguous terms of the FDPLE would not provide NVFC coverage.[18] Accordingly, even were the Ultraflex Policy reformed to include the FDPLE, Erie

---

[17] Erie's Ultraflex Policy rules clarify this prohibition further, stating that where a business is both a crematorium and a funeral home, professional liability coverage may issue, but such coverage would apply only to funeral services, not to crematory services.

[18] It is worth noting that this distinction between funeral services and crematory services is clearly contemplated by Virginia law. *See* Va. Code Ann. § 51.1-2800 (distinguishing between a "cremator," meaning a person or establishment that cremates dead bodies, and a "funeral director," meaning one who directs or supervises funerals, prepares human dead for burial or makes arrangements for funeral services). Indeed, at the time of the alleged mishandling of Marion Bohreer's remains, NVFC had been enjoined by the Fairfax County Zoning Department from performing "funeral home activities." In so doing, the Fairfax County Zoning Department distinguished between crematory services, which NVFC could continue to provide, and funeral home activities, including embalming, which NVFC could not provide. Additionally, it is worth noting that the dispute between plaintiffs Maxine Bohreer and Tricia King arose out of an agreement with NVFC to provide crematory, not funeral, services. Accordingly, any allegations

16

would still have had no duty to defend NVFC in the Underlying Action.

In conclusion, the undisputed material facts reflect that under either the Ultraflex Policy in effect at the time of Marion Bohreer's cremation or a reformed Ultraflex Policy, which would include the FDPLE, Erie had no duty to defend, and accordingly, no duty to indemnify, NVFC in the Underlying Action.

An appropriate Order will issue.

                                                  ____/s/_____

Alexandria, Virginia                                 T. S. Ellis, III

February 16, 2007                                  United States District Judge

---

arising out of NVFC's breach of the agreement or negligent performance of its terms necessarily relate to NVFC's crematory services, not its professional services as a funeral director.